**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

DANIELLE L. NERI,

      Plaintiff,

vs.                                                                   CIV 19-8 JCH/SCY

BOARD OF EDUCATION FOR
ALBUQUERQUE PUBLIC SCHOOLS
and CYNTHIA HOPPMAN,

      Defendants.

**PROPOSED FINDINGS AND RECOMMENDED DISPOSITION**

      Plaintiff Danielle Neri quit her teaching job with Atrisco Heritage Academy after an

assistant principal, Defendant Cynthia Hoppman, moved her from an IEP teaching position to a

math teaching position. Plaintiff claims that she has long suffered from post-traumatic stress

syndrome and, although she makes several arguments, the gravamen of her lawsuit is that, in

violation of the American with Disabilities Act and the New Mexico Human Rights Act,

Defendants took adverse action against her because of her disability (PTSD). Defendants have

filed a Motion for Summary Judgment on all Claims (Doc. 68).[1] Having considered her claims, I

conclude that Plaintiff has failed to establish a legally cognizable adverse employment action.

Thus, in this proposed findings and recommended disposition ("PFRD"), I recommend that the

Court GRANT Defendants' Motion for Summary Judgment as to all of Plaintiff's federal claims.

---

[1] Defendants filed this motion on September 17, 2019 and it was fully briefed October 22, 2019 (Docs. 82, 89). Related to this motion, on December 20, 2019, Defendants filed a Motion to Exclude from Summary Judgment Consideration (Doc. 100), which was fully briefed on January 3, 2020 (Docs. 101, 103). This matter was referred to me pursuant to 28 U.S.C. § 636(b)(1)(A) and Federal Rule of Civil Procedure 72(a) by United States District Judge Judith Herrera on May 1, 2019. Doc. 37. Consistent with that Order of Reference, I held a hearing on January 16, 2020. Doc. 109.

I further recommend the Court remand the state law claims to state court. I finally recommend that the Court deny Defendants' Motion to Exclude as moot.

## PROCEDURAL BACKGROUND

Plaintiff Danielle Neri filed her Complaint for Employment Discrimination on November 9, 2018 in state court. Doc. 1-1 at 8. Defendants Board of Education for the Albuquerque Public School ("APS") and Cynthia Hoppman[2] removed this action to federal court on January 7, 2019. Doc. 1. The operative complaint is Plaintiff's Third Amended Complaint for Employment Discrimination, filed May 1, 2019. Doc. 38. In that Complaint, Plaintiff alleges violations of the American with Disabilities Act ("ADA") and the New Mexico Human Rights Act ("NMHRA"). Doc. 38 at 3. Specifically, Plaintiff alleges she was subjected to a hostile work environment resulting in her constructive discharge, and that Defendants discriminated and retaliated against her based on disabilities of PTSD and anxiety disorder. Doc. 38. Although not in her Complaint or in the summary judgment briefing, Plaintiff also asserted at the hearing on Defendants' motion for summary judgment that she is bringing a failure to accommodate claim. Jan. 16, 2020 Recording at 10:20 a.m. (Hondo FTR).[3] Defendants now seek dismissal of Plaintiff's entire lawsuit on summary judgment.

## UNDISPUTED MATERIAL FACTS

The undisputed material facts, taken in the light most favorable to Plaintiff, are as follows. Plaintiff Danielle Neri worked for Defendant APS for seventeen years, starting in 2000. Doc. 82-19 ¶ 10 (Plf.'s Aff.). For approximately nine years, Plaintiff taught special education

---

[2] Cynthia Hoppman is sometime referred to in exhibits by her previous last name, Ms. Benefield, or as Cindy.

[3] The recording is available from the intake counter on the second floor in the Pete V. Domenici U.S. Courthouse.

math at Valley High School. Doc. 68 at 2 ¶ 4; Doc. 82 at 2. Then, from 2013 to 2016, she worked as an Individualized Education Plan ("IEP") teacher at Atrisco Heritage Academy ("AHA"). Doc. 68 at 1 ¶ 1; Doc. 82 at 2. Her job included facilitating all IEP meetings. Doc. 82-6 at 1. At that time, Defendant Cynthia Hoppman was the AHA Assistant Principal of Special Education and supervised Plaintiff in her role as IEP teacher. Doc. 68 at 2 ¶ 3; Doc. 82 at 2.

Plaintiff testified that during the 2015/2016 school year, Ms. Hoppman gave her additional duties such as requiring her to attend all head teacher meetings and IEP specialist meetings and also would not find replacements to cover IEPs when Plaintiff was absent. Doc. 68 at 2 ¶ 8; Doc. 82 at 2; Doc. 68-2 at 86:16-88:17 (Plf.'s depo.). Plaintiff does not know why Ms. Hoppman assigned these additional duties but believes that Ms. Hoppman was "trying to drown [her] and make it look like [she] couldn't do the job that [she] was doing." Doc. 68-2 at 88:18-22 (Plf.'s depo.); Doc. 68 at 2 ¶ 9; Doc. 82 at 5 ¶ 4.

1. The April 14, 2016 incident

On April 14, 2016, Plaintiff was scheduled to facilitate an IEP meeting with AHA teacher Daniel Kegler, an AHA student, and the student's mother. Doc. 68 at 2 ¶ 10; Doc. 82 at 6-7.[4] However, shortly after the meeting began, Plaintiff cancelled it because the mother did not speak

---

[4] Plaintiff states that she disputes facts related to this meeting but does not specifically state which facts she controverts or offer conflicting evidence. Where Plaintiff fails to directly controvert a fact, or where she fails to offer evidence to show the fact is genuinely disputed, the Court will treat the fact as undisputed. *See* D.N.M.LR-Civ. 56.1(b) ("All material facts set forth in the Memorandum [or Response] will be deemed undisputed unless specifically controverted."); Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion" in one of two ways: by "citing particular parts of materials in the record, including depositions, documents, electronically store information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers, or other materials[,]" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").

English and Mr. Kegler had not requested an interpreter. Doc. 68 at 3 ¶ 11; Doc. 82 at 7 ¶ f.

After the mother and student left, Plaintiff, Mr. Kegler, and two other AHA employees, Dina

Van Dyke and Kenneth Ballard, remained in the IEP conference room, which was also Plaintiff's

office. Doc. 68 at 3 ¶ 12; Doc. 82 at 7 ¶ g. Mr. Kegler then stood up, shoved his chair into the

wall, slammed the chair back into the table, slammed his laptop shut, and stormed out of the

room while yelling that "he didn't need an interpreter and this was bullshit." Doc. 68 at 3 ¶ 13;

Doc. 82 at 7-8 ¶ 6. When Mr. Kegler slammed his laptop his hand was approximately 18 inches

from Plaintiff. Doc. 68-2 at 106:2-4 (Plf.'s depo.). Plaintiff testified that Mr. Kegler never

verbally threatened her or physically touched her, but was acting aggressively towards her by

yelling and throwing furniture around the room. Doc. 68 at 3 ¶ 14; Doc. 82 at 8 ¶ 8; Doc. 68-2 at

106:5-7, 107:8-16, 107:17-25, 108:13-22 (Plf.'s depo.). Before the April 14, 2016 incident, Ms.

Hoppman had observed Plaintiff in violent or contentious IEP meetings, and had observed that

Plaintiff "remained calm and handled herself well." Doc. 68 at 4 ¶ 21; Doc. 82 at 3; Doc. 68-1 ¶

9 (Hoppman Aff.). However, this incident triggered Plaintiff's PTSD. Doc. 82-19 ¶ 14 (Plf.'s

Aff.).

 Dina Van Dyke, who was also present in the room, does not remember Mr. Kegler acting

aggressively or insinuating that he would become violent. Doc. 68 at 3 ¶ 15; Doc. 82 at 8. She

does not believe Mr. Kegler acted inappropriately. Doc. 68-5 ¶ 9 (Van Dyke Aff.).[5] Kenneth

---

[5] In her Response, Plaintiff argues that the Court should strike Ms. Van Dyke's and Mr. Ballad's
affidavits as "sham affidavits." Doc. 82 at 8 ¶ 9. "Sham affidavits, though 'unusual' arise when a
witness submits an affidavit that contradicts the witness's prior testimony." *Knitter v. Corvias
Military Living, LLC*, 758 F.3d 1214, 1218 n.3 (10th Cir. 2014). Plaintiff makes no such
argument, but instead asserts that Ms. Van Dyke and Mr. Ballad do not have PTSD and that Mr.
Ballad's wife worked as the IEP teacher after Plaintiff left AHA. Plaintiff's arguments relate to
witness credibility, not admissibility. Because the Court does not make credibility findings when
considering a summary judgment motion, the Court should not strike these affidavits. I note,

Ballad, who was also present in the room, recalls that Plaintiff insulted Mr. Kegler until he said "enough" and walked out of the room. Doc. 68 at 3 ¶ 16; Doc. 82 at 8-9 ¶ 9; Doc. 68-6 ¶¶ 8-9 (Ballad Aff.). He did not observe Mr. Kegler acting aggressively and does not believe Mr. Kegler acted inappropriately. Doc. 68 at 3 ¶ 16; Doc. 82 at 8-9 ¶ 9; Doc 68-6 ¶¶ 10, 13 (Ballad Aff.).

Immediately after the incident, Plaintiff sent an email to Ms. Hoppman which stated that "[Kegler] just had a hissy fit and blew up in the meeting." Doc. 68 at 3 ¶ 17; Doc. 82 at 3. That same day, April 14, 2016, Ms. Hoppman contacted Mr. Ballard and Ms. Van Dyke who informed her that both Plaintiff and Mr. Kegler became frustrated, that Mr. Kegler left the meeting, and that nothing out of the ordinary happened. Doc. 68 at 4 ¶ 19; Doc. 82 at 9 ¶ 11; Doc. 68-1 ¶¶ 11-12 (Hoppman Aff.). Ms. Hoppman did, however, speak with Mr. Kegler and told him "that he cannot get frustrated when meetings are canceled due to the lack of a translator." Doc. 68 at 4 ¶ 25; Doc. 82 at 10-11 ¶ 13; Doc. 68-1 ¶ 17 (Hoppman Aff.).

The following morning, on April, 15, 2016, Plaintiff met with Ms. Hoppman and told her Mr. Kegler acted inappropriately, that his actions "were an assault," and that he needed to be talked to. Doc. 68 at 4 ¶ 18; Doc. 82 at 8-9 ¶ 9; Doc. 68-2 at 113:3-14 (Plf.'s depo.). Ms. Hoppman told Plaintiff that she had spoken with Mr. Ballard and Ms. Van Dyke and that she understood that Mr. Kegler "had gotten frustrated, but it was no big deal." Doc. 68 at 4 ¶ 20; Doc. 82 at 3; Doc. 68-2 at 113:3-9.

Around lunchtime that same day, Plaintiff had another IEP meeting scheduled with Mr. Kegler. Doc. 68 at 4 ¶ 22; Doc. 68-2 at 114:3-19 (Plf.'s depo.). An AHA administrator, Annette

---

however, that the Court draws all reasonable factual inferences in favor of Plaintiff, the non-moving party.

Tafoya, also attended that IEP meeting. Doc. 68 at 4 ¶ 22. Plaintiff initially believed that Ms.

Tafoya was sent to the IEP meeting as a mediator and to "make sure [Plaintiff] was okay and

could handle the meeting." Doc. 68-2 at 115:3-10 (Plf.'s depo.). However, Plaintiff later learned

from Ms. Hoppman that Ms. Hoppman gave Mr. Kegler some bad news and so she sent Ms.

Tafoya to the meeting to support Mr. Kegler. Doc. 68 at 4 ¶ 23; Doc. 82 at 9-10 ¶ 12. Plaintiff

felt that Ms. Hoppman was "making sure that [Plaintiff] knew [she] was not safe at work." Doc.

68 at 4 ¶ 24; Doc. 82 at 9-10 ¶ 12; Doc. 68-2 at 118:10-16 (Plf.'s depo.).

Following the April 14, 2016 incident, Plaintiff worked every school day until either

April 25 or April 26. Doc. 68-2 at 118:10-19. On April 25 or April 26, 2016, Plaintiff requested

Family and Medical Leave Act ("FMLA") leave because she "couldn't go to work and feel safe

anymore." Doc. 68 at 4 ¶ 26; Doc. 82 at 11 ¶¶ 14, 15. Plaintiff returned to work on May 11, 2016

and performed her job until May 23, 2016.[6] Doc. 68 at 5 ¶ 27; Doc. 82 at 2.

2. Plaintiff's evaluation and transfer

On May 23, 2016, Plaintiff had her year-end evaluation with Ms. Hoppman. Doc. 68 at 5

¶ 28; Doc. 82 at 11-12 ¶¶ 16-17. At that meeting they discussed Plaintiff's Professional

Development Plan ("PDP"). Doc. 68 at 5 ¶ 29; Doc. 82 at 11-12 ¶¶ 16-17. Plaintiff wrote in her

PDP that she was overwhelmed, had quite a few late IEPs, and was late on a deadline. Doc. 68 at

5 ¶ 29; Doc. 82 at 11-12 ¶¶ 16-17. Ms. Hoppman, as Plaintiff's evaluator, wrote in her statement

of employee progress that Plaintiff's "fortitude, work ethic, and leadership have been

instrumental in creating an excellent special ed team at AHA." Doc. 82 at 11-12 ¶ 16; Doc. 82-

11.

---

[6] The parties dispute whether Plaintiff worked until May 23 or May 25. The two-day difference
is immaterial to Plaintiff's claims.

During the evaluation, Ms. Hoppman told Plaintiff she would be assigned to be a special education math teacher position at AHA for the 2016/2017 school year. Doc. 68 at 5 ¶ 30; Doc. 82 at 12 ¶ 17. Ms. Hoppman told Plaintiff  that she did not "believe that [Plaintiff] can handle the contention of the [IEP] room anymore," and she did not "want to trigger [Plaintiff] again." Doc. 68-2 at 134:12-22. Plaintiff testified that this was the only reason Ms. Hoppman gave her during their meeting to justify the transfer. Doc. 68-2 at 135:8-20. Following the evaluation, Plaintiff sent Ms. Hoppman an email, stating that she felt her disability of PTSD was being used against her. Doc. 82 at 12 ¶ 19; Doc. 82-9. Ms. Hoppman sent Plaintiff a reply email the following day, May 24, 2016, listing many reasons for the decision to transfer Plaintiff, including rescheduled IEPs, Plaintiff's failure to manage her caseload, missed deadlines, excessive absences, and failure to respond to emails. Doc. 82 at 12 ¶ 19; Doc. 82-9.

Ms. Hoppman told Plaintiff the transfer was not a demotion. Doc. 68 at 5 ¶ 32; Doc. 82 at 13 ¶¶ 20, 21. Plaintiff, however, viewed the transfer as a demotion and a "step back" in her career to a less prestigious position. Doc. 68 at 5 ¶ 33; Doc. 82 at 13 ¶ 22. The Negotiated Agreement governing terms and conditions of employment for APS teachers did not distinguish between special education teachers and IEP teachers. Doc. 68 at 5 ¶ 34; Doc. 82 at 13 ¶ 23. Plaintiff would have earned the same salary and received the same medical and dental benefits as a special education math teacher that she received as an IEP teacher. Doc. 68 at 5 ¶ 35; Doc. 82 at 14 ¶ 24. Plaintiff, however, believed the IEP teacher position had better benefits because she had "top clearance" for an IEP database and could educate other teachers. Doc. 68 at 5-6 ¶ 36; Doc. 82 at 14 ¶ 24. And although Plaintiff testified that the IEP position allowed her more compensatory time, she also testified that she was unable to use compensatory time during her last year as an IEP teacher. Doc. 68 at 6 ¶ 37; Doc. 82 at 14 ¶ 24.

3. Plaintiff's damages

Plaintiff claims she has had PTSD for over 30 years but asserts that the April 14, 2016 incident triggered her PTSD in a much more severe manner than ever before. Doc. 82-19 ¶ 25 (Plf.'s Aff.). Following the May 23, 2016 evaluation, Plaintiff suffered panic attacks that impacted her thinking, breathing, communication, brain function, sleep, and organizational skills. Doc. 82-19 ¶ 26 (Plf.'s Aff.).

After the evaluation, Plaintiff took a year-long personal unpaid leave of absence. Doc. 68 at 6 ¶ 38; Doc. 82 at 14 ¶ 24. Her goal during the year was to "get back to [herself] from dissociative state," and "see if [she] could work for APS in what was an unsafe place for [her]." Doc. 82-19 ¶ 22 (Plf.'s Aff.); Doc. 82 at 14 ¶ 24. On March 9, 2017, Plaintiff resigned from APS. Doc. 68 at 6 ¶ 39; Doc. 82 at 14 ¶ 24.

4. Absence of request for accommodation

Before April 2016, Plaintiff never notified APS that a disability impacted her job performance. Doc. 68 at 6 ¶ 40; Doc. 82 at 14 ¶ 25.[7] Sometime between the April 14, 2016 incident and the time Plaintiff took FMLA leave on April 25 or April 26, Plaintiff asked Ms. Hoppman to sit down with her, but never asked Ms. Hoppman or APS for an accommodation. Doc. 68-2 at 118:20-19:11 (Plf.'s depo.); Doc. 68 at 6 ¶ 40; Doc. 82 at 14 ¶ 25. On May 29, 2016, the APS Equal Opportunity Services ("EOS") office sent Plaintiff paperwork for requesting an accommodation, but she never completed it.[8] Doc. 68 at 6 ¶ 41; Doc. 82 at 14 ¶ 25.

---

[7] In response to this statement of fact, Plaintiff argues that the Court should strike Ms. Hoppman's affidavit, attached to Defendants' Motion as Exhibit A. Doc. 82 at 14 ¶ 25. However, Defendants support these statements of fact (facts No. 40-42) with citation to Plaintiff's deposition, not with citation to Ms. Hoppman's affidavit. *See* Doc. 68 at 6 ¶¶ 40-42. In addition, Plaintiff has offered no valid reason to strike Ms. Hoppman's affidavit.

[8] Plaintiff does not dispute that she never requested an accommodation. Instead, she asserts that an EOS representative tried to convince her not a file a complaint and to fill out the

The paperwork included a form to be filled out by Plaintiff's healthcare provider which sought information regarding Plaintiff's disability, medical diagnosis, etiology of the condition, impairments related to the condition, impact of the condition on various activities, and possible accommodations. Doc. 68 at 6 ¶ 42; Doc. 82 at 14 ¶ 25.

5. EEOC complaint

On May 24, 2016, Plaintiff submitted an Equal Employment Opportunity Commission ("EEOC") Intake Questionnaire to the EEOC and to the EOS office of APS. Doc. 68 at 6 ¶ 43; Doc. 82 at 15 ¶ 26. Plaintiff listed two discriminatory events on the questionnaire: 1) May 23, 2016: "At the end of my evaluation, I was told that so my PTSD is not triggered again, I would not be the IEP teacher but was offered a math position (demoted because PTSD)"; and 2) April 14, 2016: "This was the first email that expressed that the aggressive actions by a teacher was a huge trigger for my PTSD, 3 2 email 1 conversation [sic], ignored then minimized- complicating sit." Doc. 68-9 (Intake Questionnaire); Doc. 68 at 7 ¶ 44; Doc. 82 at 16 ¶ 30. In the Charge of Discrimination, Plaintiff listed the dates discrimination took place as April 16, 2016 to May 23, 2016, and described in the narrative the April 14, 2016 incident and the May 23, 2016 evaluation. Doc. 12-1.

**STANDARD OF REVIEW**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute about a material fact is "genuine" if the evidence is such that a

---

accommodation paperwork instead. Doc. 82 at 15 ¶ 27. She offers no evidence to support this allegation. Further, she argues in her response that the Court should strike "any information pertaining to EOS office," on the basis of her allegations that the EOS office director has falsified numerous forms. Doc. 82 at 15-16 ¶ 28. Again, however, she offers no evidence to support the allegation.

reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In other words, a dispute is genuine "if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and it is material "if under the substantive law it is essential to the proper disposition of the claim." *Becker v. Bateman*, 709 F.3d 1019, 1022 (10th Cir. 2013) (internal quotation marks omitted).

In reviewing a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the non-moving party. *S.E.C. v. Thompson*, 732 F.3d 1151, 1156-57 (10th Cir. 2013) (internal quotation marks omitted). Initially, the party seeking summary judgment has the burden of showing that there is no genuine dispute as to any material fact. *See Shapolia v. Los Alamos Nat'l Lab*., 992 F.2d 1033, 1036 (10th Cir. 1993). Once the moving party meets its burden, the non-moving party must show that genuine issues remain for trial. *Id.*

When a plaintiff proceeds pro se, the court generally construes her pleadings liberally, holding them to a less stringent standard than those a party represented by counsel files. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). In so doing, the court makes allowance for a pro se litigant's "failure to cite proper legal authority, [her] confusion of various legal theories, [her] poor syntax and sentence construction, or [her] unfamiliarity with pleading requirements." *Id.* The court will not, however, construct arguments or search the record for the pro se party. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). Issues will be waived if the pro se party's briefing "consists of mere conclusory allegations with no citations to the record or any legal authority for support." *Id.*

**DISCUSSION**

**I.  Discrimination under the ADA**

Plaintiff alleges Defendants violated the ADA. The purpose of the ADA is "to provide

clear, strong, consistent enforcement standards addressing discrimination against individuals

with disabilities." 42 U.S.C. § 12101(b)(2). Although Plaintiff brings no claims under Title VII,

Title VII cases are relevant because the Tenth Circuit generally interprets the ADA and Title VII

consistently due to the similarities between the statutes. *E.E.O.C. v. C.R. England, Inc.*, 644 F.3d

1028, 1038 n.11 (10th Cir. 2011)."To establish a prima facie case of disability discrimination

under the ADA, Plaintiff must prove that she "(1) is a disabled person as defined by the ADA;

(2) is qualified, with or without reasonable accommodation, to perform the essential functions of

the job held or desired; and (3) suffered discrimination by an employer . . . because of that

disability." *C.R. England, Inc.*, 644 F.3d at 1037-38. In order to satisfy the third prong, "a

plaintiff must generally show that [s]he has suffered an adverse employment action because of

the disability." *Id.* at 1038 (quotations omitted).

Ms. Neri's claims under the ADA are subject to the familiar burden-shifting analysis of

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). *See Rakity v. Dillon Cos.*, 302

F.3d 1152, 1164 (10th Cir. 2002) ("In *McDonnell Douglas Corp. v. Green*, the Supreme Court

set out an analytical framework for allocating the burden of proof in Title VII employment

discrimination cases. We subsequently adapted this framework to Americans with Disability Act

discrimination cases."). Under that framework, "the initial burden is on the employee to make a

prima facie showing of discrimination by the employer." *Sprague v. Thorn Americas, Inc.*, 129

F.3d 1355, 1362 (10th Cir. 1997) (internal quotation marks omitted). If the plaintiff establishes a

prima facie case for any of her discrimination claims, "the burden shifts to the defendants to

articulate a legitimate, nondiscriminatory reason for its actions." *C.R. England, Inc.*, 644 F.3d at 1038. Finally, "[i]f the defendant proffers such a reason, the burden then shifts back to the plaintiff to show that the defendant's stated reasons are merely 'pretextual.'" *Tesone v. Empire Marketing Strategies*, 942 F.3d 979, 995 (10th Cir. 2019).

Here, Defendants do not address the issue of pretext. Rather, their summary judgment motion succeeds or fails on the question of whether Plaintiff has established a prima facie case for discrimination. Doc. 89 at 17. The first element of the prima facie case, whether Plaintiff was disabled or regarded as disabled during the relevant time period, is the most difficult to resolve and so I recommend that the Court not focus its analysis on this element. The second element of the prima facie case, whether Plaintiff was qualified (with or without reasonable accommodation) to perform the essential functions of an IEP teacher, is not one Defendants contest at this point and so is easily resolved in Plaintiff's favor. On the other hand, the third element, whether Plaintiff suffered an adverse action, should be resolved in Defendants' favor. Plaintiff alleges three different categories of adverse action: hostile work environment, discrimination based on transfer of position, and constructive discharge. For each category, Plaintiff fails to present evidence sufficient to meet her prima facie burden. Therefore, the Court should grant Defendants' motion to dismiss Plaintiff's discrimination claims on summary judgment.

### A. The First Prima Facie Element: Disability

"[A]ny plaintiff asserting a [discrimination] claim under the ADA must establish he or she is a 'qualified individual with a disability.'" *Lanman v. Johnson County, Kansas*, 393 F.3d 1151, 1156 (10th Cir. 2004) (quoting 42 U.S.C. § 12112(a)). "Disability is defined by the ADA as '(A) a physical or mental impairment that substantially limits one or more of the major life

activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such impairment.'" *Id.* (quoting 42 U.S.C. § 12102(2)). The parties do not address whether Plaintiff has a record of impairment. Instead, their arguments focus on whether Plaintiff has an actual impairment or whether Defendants regarded her as having an impairment.

### 1.  Actual disability or impairment

Plaintiff asserts she suffers from PTSD. To establish an actual impairment, Plaintiff "must (1) have a recognized impairment, (2) identify one or more appropriate major life activities, and (3) show the impairment substantially limits one or more of those activities." *Felkins v. City of Lakewood*, 774 F.3d 647, 650 (10th Cir. 2014).

Defendants rely on *Felkins* to argue that without "expert testimony, Plaintiff cannot establish that her PTSD constitutes a disability under the ADA . . . ." Doc. 68 at 12. In *Felkins*, the plaintiff provided two forms filled out by a physician assistant to support her claim for disability. 774 F.3d at 651. However, neither specifically mentioned plaintiff's alleged disability of avascular necrosis or a description of its effects on her. *Id.* Accordingly, the only evidence in the record to support plaintiff's alleged disability was her own declarations, which the court found inadmissible lay witness testimony. *Id.* Applying Federal Rule of Evidence 701, the court held that the plaintiff's "declarations are admissible insofar as they describe her injuries and symptoms . . . . They are inadmissible, however, insofar as they diagnose her condition as avascular necrosis or state how that condition causes limitations on major life activities, for those are clearly matters beyond the realm of common experience and . . .  require the special skill and knowledge of an expert witness." *Id.* at 652.

I do not read *Felkins* as broadly as Defendants. While expert medical testimony may be used to establish a disability, "no language in the ADA or implementing regulations states that

medical testimony is required." *Tesone*, 942 F.3d at 996 (quotation omitted). "Rather, whether medical evidence is necessary to support a disability discrimination claim is a determination that must be made on a case-by-case basis." *Id.* While rare conditions, such as the plaintiff's alleged avascular necrosis in *Felkins*, may require expert testimony, an "impairment or disability that is obvious or can be fathomed without expert guidance" does not require expert testimony. *Id.* at 998.

Plaintiff's claimed disability of PTSD falls somewhere in between a rare condition such as avascular necrosis that must be established through expert testimony and a more apparent disability such as a missing limb, which could be established without the need for expert testimony. The Court need not resolve whether Plaintiff needs an expert[9] and can establish an actual impairment because, even if she can establish an actual impairment, she cannot establish that she suffered any adverse actions because of her actual impairment.

### 2. Regarded as having a disability or impairment

Plaintiff appears to argue that Defendants regarded her as having a disability. Indeed, in viewing the evidence in the light most favorable to Plaintiff, when Ms. Hoppman informed Plaintiff that she was being moved from the IEP teacher position, she told Plaintiff that she did not "believe that [Plaintiff] can handle the contention of the [IEP] room anymore," and she did not "want to trigger [Plaintiff] again." Doc. 68-2 at 134:12-22.

---

[9] Defendants point out that Plaintiff designated her therapist, Billie Poteet, to testify regarding her disability. Doc. 68 at 12. Ms. Poteet testified that Plaintiff has PTSD. Doc. 68-4 at 12:20-24. However, Ms. Poteet testified that she is not qualified to offer expert testimony as to whether a person is disabled under the ADA. Doc. 68-4 at 14:14-24 to 15:1-16. In her response brief, Plaintiff also attached a letter from Stephanie Tucker, M.D. dated September 23, 2019 in which Dr. Tucker states she diagnosed Plaintiff with PTSD. Doc. 82-23. However, this letter does not state whether Plaintiff had PTSD at the time of the incident at issue in this case. Further, Defendants move to strike this letter and any mention of Dr. Tucker because Plaintiff never disclosed Dr. Tucker as an expert witness. Doc. 100 at 7.

A "regarded-as" disability requires a showing that the Defendants *mistakenly* "believe[] that a person has a physical impairment that substantially limits one or more major life activities," or Defendants *mistakenly* "believe[] that an actual, nonlimiting impairment substantially limits one or more major life activities." *Lanman*, 393 F.3d at 1156. To survive on a "regarded-as" claims, Defendants have to *mistakenly* regard Plaintiff as *both* (1) having a disability and (2) substantially limited in a major life activity. *Id.* In this case, Plaintiff never alleges that Defendants were mistaken about her PTSD. Quite the opposite, in fact. She insists that she does in fact have PTSD.

Of course, if Defendants were to prevail on their argument that Plaintiff never had a disability, any belief they had in May 2016 that Plaintiff was disabled would be mistaken. Viewing the evidence in the light most favorable to Plaintiff, then, Plaintiff arguably could meet her prima facie burden of showing that Defendants moved her into the math teaching position because they regarded her as disabled. The Court need not resolve this issue, however, because even if Defendants regarded Plaintiff as having an impairment, she cannot establish that she suffered any adverse actions because of the perceived impairment.

## B.  The Third Prima Facie Element: Adverse Action

I recommend finding that Plaintiff's ADA claims fail under the third prong of the prima facie case for discrimination because she is unable to show that she suffered any adverse action as a result of her disability.

15

### 1. Discrimination Based On Hostile Work Environment

The first adverse action Plaintiff asserts is that Ms. Hoppman and APS created a hostile work environment throughout the 2015/2016 school year. Doc. 38 at 5-6.[10] The ADA "provides that no employer covered by the Act 'shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to . . . terms, conditions, and privileges of employment." *Lanman*, 393 F.3d at 1155 (quoting 42 U.S.C. § 12112(a)). The Tenth Circuit has interpreted this language to mean that a hostile work environment claim is actionable under the ADA. *Id.* at 1156.

### a. Exhaustion

As a threshold matter, Defendants argue that Plaintiff failed to exhaust any claim she would have for a hostile work environment prior to April 14, 2016. Doc. 68 at 16. On this point, I disagree: Exhaustion is an affirmative defense and Defendants have not met their burden to establish it.

"[T]he ADA requires a plaintiff to exhaust her administrative remedies before filing suit," and exhaustion requires filing a charge of discrimination with the EEOC. *Jones v. United Parcel Serv., Inc.*, 502 F.3d 1176, 1183 (10th Cir. 2007). The Tenth Circuit no longer considers exhaustion a jurisdictional issue, clarifying that "a plaintiff's failure to file an EEOC charge regarding a discrete employment incident merely permits the employer to raise an affirmative defense of failure to exhaust but does not bar a federal court from assuming jurisdiction over a claim." *Lincoln v. BNSF Railway Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018). The Court may

---

[10] The Tenth Circuit has questioned whether a hostile work environment claim must be brought as a standalone claim rather than a "an adverse employment action under the ADA." *Williams v. FedEx Corp. Servs.*, 849 F.3d 889, 897 (10th Cir. 2017). But because Plaintiff is pro se, the Court construes her pleadings liberally and considers the hostile work environment claim on the merits.

consider this affirmative defense in deciding summary judgment motions. *Cirocco v. McMahon*, 768 F. App'x 854, 858 (10th Cir. 2019).

"To satisfy the exhaustion requirement, a claim must be within the scope of the administrative investigation that could reasonably be expected to follow from the allegations raised in the charge." *Macias v. Sw. Cheese Co.*, 624 F. App'x 628, 634-35 (10th Cir. 2015) (quotations omitted). "Allegations 'are minimally sufficient to satisfy the requirements for the contents of a charge of discrimination and the purposes of the notice requirement' when they 'identif[y] the type of discrimination complained of, the alleged harasser, and an approximate time period.'" *Id.* at 635 (quoting *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1260 (10th Cir. 1998)).

In this case, in response to the question on the EEOC Intake Questionnaire and Charge of Discrimination form that asked Plaintiff to describe "[w]hat happened to you that you believe was discriminatory?", Plaintiff noted the April 14, 2016 incident with Mr. Kegler and the May 23, 2016 evaluation with Ms. Hoppman. Docs. 68-9, 12-1. When the form then asked why Plaintiff considered these actions discriminatory, Plaintiff responded "because if I did not have PTSD I would still be in the position I piloted and held for two years. Because I was taken out of the position I held for the last three years, because of my PTSD was trigged [sic] then ignored and minimized which caused a stress reaction that deregulated my emotions to the point that I needed to take a 10 day leave under FMLA." Doc. 68-9 at 2. Plaintiff then references Attachment #1, *id.*, which is not included in the record.

The record currently before the Court shows that Plaintiff's charge of discrimination only discussed the April 14, 2016 incident and the following events. However, without Attachment #1, the Court cannot definitively say that Plaintiff did not address alleged discrimination or

harassment occurring before the April 14, 2016 incident. As such, Defendants have failed to meet their burden on their affirmative defense of failure to exhaust.

### b. Insufficiency of hostile work environment evidence

To establish a claim for hostile work environment, the plaintiff must show that the discrimination "was sufficiently severe or pervasive such that it altered the terms or conditions of her employment and created an abusive working environment." *Morris v. City of Colorado Springs*, 666 F.3d 654, 663 (10th Cir. 2012) (quoting *Medina v. Income Support Div.*, 413 F.3d 1131, 1134 (10th Cir. 2005)). To that end, "a plaintiff must show that the environment was both objectively and subjectively hostile or abusive." *Id.* (quotation omitted). Determining whether an environment is objectively hostile requires the court to consider all circumstances, including "such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quotations omitted).

In this case, Plaintiff clearly subjectively viewed certain events as creating a hostile work environment. *See* Doc. 82 at 22; Doc. 82-19 (Plf.'s Aff.). The Court must therefore determine whether the undisputed facts show an objectively hostile environment. Plaintiff alleges the following events created a hostile work environment: Ms. Hoppman continually harassed her throughout the 2015/2016 school year; Ms. Hoppman changed her job's expectations and benefits throughout the 2015/2016 school year; in the April 14, 2016 IEP meeting Mr. Kegler shoved his chair into the wall and slammed his laptop shut; Ms. Hoppman told Plaintiff that the

April 14, 2016 incident was "no big deal"; and Ms. Hoppman sent support for Mr. Kegler at the

April 15, 2016 IEP meeting.[11] *See* Doc. 82 at 22; Doc. 38.

I conclude that no reasonable jury could determine that these facts show an objectively

hostile work environment, as the alleged hostile conduct was neither pervasive nor severe. First,

Plaintiff does not adequately support her general claim that Ms. Hoppman continually harassed

her. Plaintiff claims Ms. Hoppman added additional duties to Plaintiff's workload in the

2015/2016 school year, Doc. 85 at 2, and that Ms. Hoppman changed the "expectations and

fringe benefits" that came with the IEP teacher position, Doc. 38 at 5.[12] To support this

allegation, Plaintiff alleges Ms. Hoppman made her attend all head teacher meetings and IEP

specialist meetings and would not find replacements to cover IEPs when Plaintiff was absent.

Plaintiff also attached a series of emails to her response brief in an effort to support her position

that "Defendants' [sic] harassed Plaintiff on an almost daily basis." Doc. 82 at 22. The emails

span from January 2016 to June 2016, and most include questions from Ms. Hoppman to

Plaintiff regarding the status of certain IEPs. Plaintiff's examples do not show pervasive

harassment and, even if they did, fall far short of demonstrating severe harassment. Such routine

job stressors do not create a hostile work environment. *See Trujillo v. Univ. of Colo. Health Sci.*

*Center*, 157 F.3d 1211, 1214 (10th Cir. 1998) ("The hostile work environment that Plaintiff

---

[11] Plaintiff's subsequent transfer to a math teaching position is not part of her hostile work environment claim.

[12] In her Complaint, Plaintiff also states that Ms. Hoppman "created intolerable working conditions along with destroying my professional reputation within the district, these along with the daily microscopic seek and destroy missions, she orchestrated between her and two possible three others within the special education department, making it such a hostile work environment, that no reasonable person would be able to continue working within." Doc. 38 at 5-6. It is not clear if she is referencing events other than those listed above, because she provides no other specific allegations or details.

portrays is simply a work environment that exhibits the monitoring and job stress of life in the real world. Normal job stress does not constitute a hostile or abusive work environment.").

Further, the April 14, 2016 incident was neither pervasive nor severe. Plaintiff had one contentious IEP with Mr. Kegler. Although Plaintiff does also complain about the IEP meeting she had with Mr. Kegler the next day, she does not assert that the April 15 IEP meeting was contentious. Instead, she complains that a third person attended this IEP meeting as support for Mr. Kegler, which made her feel like she was not safe and that Ms. Hoppman was looking out for Mr. Kegler and not for her. Objectively, the mere presence of a third person at an uneventful meeting, who did not act in an intimidating or threatening manner, cannot support a claim of hostility. Thus, the Court must consider the April 14, 2016 meeting as an isolated event rather than as part of a pervasive pattern of hostility. An isolated incident like this simply does not constitute a pervasively hostile work environment. *See Morris,* 666 F.3d at 666 (holding that a plaintiff does not make a sufficient showing of a pervasively hostile work environment "by demonstrating a few isolated incidents . . . ." (citation omitted)).

Mr. Kegler's alleged conduct at the April 14, 2016 meeting was also not objectively severe. Although Plaintiff asserts that Mr. Kegler acted aggressively towards her, she testified that he did not actually threaten her or touch her. Further, Mr. Kegler's act of pushing his chair against the wall and slamming the lid of his laptop closed does not constitute a severely hostile act toward Plaintiff. Aside from Plaintiff's self-serving statements, the only evidence of Mr. Kegler's actions comes from the other two people in the room: Mr. Ballad and Ms. Van Dyke. Both of these witnesses told Ms. Hoppman that they did not believe Mr. Kegler acted inappropriately. Although the Court does not weigh the credibility of witnesses at the summary judgment stage and must draw all factual inferences in favor of Plaintiff, Plaintiff's objective

20

account of the incident does not conflict with these witnesses. Instead, the conflict arises from Plaintiff's subjective belief that Mr. Kegler's actions constituted severely hostile conduct toward her. Despite Plaintiff's subjective belief, however, the evidence does not support an objective determination that Mr. Kegler acted in a severely hostile manner toward Plaintiff on April 14, 2016.

Plaintiff also presents no evidence that the alleged discrimination (the hostile work environment) was based on her disability. She makes no arguments and presents no facts to show that Ms. Hoppman's conduct throughout the 2015/2016 school year or Mr. Kegler's actions on April 14, 2016 were because of Plaintiff's PTSD or because she was regarded as having PTSD. *See C.R. England, Inc.*, 644 F.3d at 1037-38 (to establish a prima facie case of disability discrimination under the ADA, Plaintiff must prove that she "(1) is a disabled person as defined by the ADA; (2) is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) suffered discrimination by an employer . . . *because of that disability*.") (emphasis added). Further, even if Ms. Hoppman later moved Plaintiff to a position as a math teacher because she regarded Ms. Hoppman as having PTSD, this act does not form the basis for a hostile work environment claim.

Under the totality of circumstances, no reasonable person could find that Plaintiff was subjected to a hostile work environment. Therefore, I recommend granting summary judgment in Defendants' favor on Plaintiff's hostile work environment claim.

### 2.  Discrimination based on transfer to math teaching position

Plaintiff argues that her transfer to a math teacher position itself constituted an adverse employment action. Doc. 38 at 4, ¶¶ 1-2 (Operative Complaint). Specifically, Plaintiff asserts that Ms. Hoppman demoted her to the math teacher position because Ms. Hoppman "felt the IEP

room was too continuous [sic], and she didn't want to trigger [Plaintiff's] PTSD again." Doc. 38 at 4, ¶ 2. To prevail on such a claim, "a plaintiff must generally show that [s]he has suffered an adverse employment action because of the disability." *C.R. England*, 644 F.3d at 1038 (quotations omitted). Plaintiff has not done so.

"In general, only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of adverse employment action." *Id.* at 1040 (quotations omitted). However, adverse employment action is liberally defined and requires "a case-by-case approach, examining the unique factors relevant to the situation at hand." *Sanchez v. Denver Public Schools*, 164 F.3d 527, 532 (10th Cir. 1998) (quotation omitted). And while adverse employment action is not limited to "monetary losses in the form of wages or benefit, . . . a mere inconvenience or alternation of job responsibilities does not constitute an adverse employment action." *C.R. England*, 644 F.3d at 1040 (quotations omitted).

Plaintiff claims that transferring her to a math teaching position constituted an adverse employment action because the IEP position allowed her more compensatory time and was more prestigious.[13] Plaintiff also asserts in her response brief that the IEP position carried an "eventual pay increase" and the transfer to math teacher would "affect future monetary wage." Doc. 82 at 21. However, she offers no evidence to support these assertions.

The Tenth Circuit's decision in *Sanchez* provides guidance as to whether the act of transferring Plaintiff to a math teaching position can constitute an adverse employment action. In

---

[13] I limit my analysis to the reasons Plaintiff asserts the math teaching position was inferior to the IEP teaching position.

*Sanchez*, the Tenth Circuit found that a teacher had not established a prima facie case for discrimination based on a transfer of position. 164 F.3d at 532. In that case, the plaintiff worked for Denver Public Schools, teaching fourth grade at Johnson Elementary. *Id.* at 530. After fourth grade enrollment decreased, the school decided to transfer the plaintiff to a second-grade position at a different elementary school within the district. *Id.* The court held that the "purely lateral transfer" did not constitute an adverse employment action because the plaintiff's "salary and benefits remained the same, [] she continued to teach at the elementary school level, and [] the decreasing student population at Johnson prompted the transfer." *Id.* at 532. The court did "not find any special circumstances unique to this case that show this employment action was anything beyond a mere inconvenience or alteration of job responsibilities." *Id.; see also McCrary v. Aurora Public Schools*, 57 F. App'x 362 (10th Cir. 2003) (finding a transfer from third grade teacher to classroom support teacher was not an adverse action when the new position carried the same salary and benefits as the previous one, even though the plaintiff felt the transfer was a demotion because it was made against her will and involved a change in job responsibilities).

Similarly in this case, Plaintiff experienced a purely lateral transfer from the IEP teacher position to the math teacher position within the same school. Both positions carried the same salary and medical benefits and were governed by the same terms and conditions of employment under the Negotiated Agreement. Plaintiff was also qualified for the math teacher position – she successfully taught special education math at Valley High School for nine years. *See Watson v. Norton*, 10 F. App'x 669, 678 (10th Cir. 2001) (finding no adverse employment action when the plaintiff was transferred to a new position that (1) carried the same salary, rank, and grade, (2)

was located in the same building with the same supervisor, and (3) had different responsibilities, but that the plaintiff was qualified to undertake).

In addition, although Plaintiff argues that the IEP position allowed her more compensatory time, she testified that she was unable to use compensatory time during her last year as an IEP teacher. She also provides no evidence that she would have had more compensatory time going forward. *See C.R. England, Inc.*, 644 F.3d at 1041 ("[T]he *potential* that the [employer's action] could have adversely affected [the plaintiff's] employment at some unknown time in the future, at least on this record, is not enough to support a claim under the ADA"). Thus, the evidence does not support Plaintiff's contention that the transfer in teaching assignments and corresponding decrease in compensatory time available constituted an adverse action.

Plaintiff also testified that she viewed the change in position as a demotion because she believes the IEP teacher position is more prestigious. However, "[i]f a transfer is truly lateral and involves no significant changes in an employee's conditions of employment, the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." *Sanchez*, 164 F.3d at 532 n.6. Viewing the circumstances of this case from an objective perspective, the transfer of Plaintiff from an IEP teacher position to a math teacher position did not constitute an adverse employment action. Accordingly, Plaintiff has not established a prima facie case for discrimination under the ADA.

Plaintiff dedicates a large portion of her response brief to arguing that Ms. Hoppman transferred her to the math teacher position because of her disability. She focuses on Ms. Hoppman saying she "didn't want to trigger Plaintiff's PTSD again," but then accuses her of attempting to cover-up that discrimination by emailing Plaintiff and offering other reasons, after

the fact, for Plaintiff's transfer. Even if Plaintiff is correct that Ms. Hoppman transferred Plaintiff because of Plaintiff's disability or because she regarded Plaintiff as having a disability, Plaintiff is still unable to show that the transfer was an adverse employment action. In other words, Plaintiff cannot satisfy the first step of the *McDonnell Douglas* test to make out a prima facie case. Summary judgment in favor of Defendants is warranted regardless of whether Defendants can offer a legitimate, nondiscriminatory reason for their actions.

### 3.  Discrimination based on constructive discharge

As a final alleged adverse action, Plaintiff asserts that "[t]hroughout the school year, 2015/2016, [Ms. Hoppman] forced my constructive discharge due to my mental disability, creating such a hostile work environment it became extremely intolerable." Doc. 38 at 4, ¶ 3. "Constructive discharge occurs when the employer by its illegal discriminatory acts has made working conditions so difficult that a reasonable person in the employee's position would feel compelled to resign." *Sanchez*, 164 F.3d at 534 (quotation omitted). A plaintiff must show the conditions of employment were objectively intolerable and that she "had no other choice but to quit." *Id.* (quotations omitted). "[C]onstructive discharge can be regarded as an aggravated case of . . . hostile work environment." *Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 851 (10th Cir. 2007) (quoting *Suders*, 542 U.S. at 146).

As discussed above, Plaintiff is unable to show that she was subjected to an objectively hostile work environment due to her disability or that the transfer to a math teaching position constituted an adverse action. Nor does Plaintiff provide any other facts through which a reasonable jury could determine that Defendants constructively discharged her. As a result, Plaintiff has not established a prima facie case for constructive discharge. Therefore, I

recommend granting summary judgment in Defendants' favor on Plaintiff's constructive discharge claim.

## II.  Failure to Accommodate

At the January 16, 2020 hearing on Defendants' Motion for Summary Judgment Plaintiff asserted that Defendants failed to accommodate her disability after the April 14, 2016 incident. Recording at 10:20. An employer violates the ADA in "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . . ." 42 U.S.C. § 12112(b)(5)(A). Plaintiff, however, never included a failure to accommodate claim in her Complaint and has never sought to amend her Complaint to bring such a claim. Similarly, Plaintiff never asserts in her briefs that she has brought a failure to accommodate claim. As a result, I recommend that the Court reject Plaintiff's untimely assertion that she has brought a failure to accommodate claim.[14]

Further, even if Plaintiff were allowed to bring such a claim, it would fail. ADA regulations clarify that "[t]o determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations." 29 C.F.R. § 1630.2(o)(3). The Tenth Circuit has explained that this interactive process envisioned by the federal regulations "requires participation by both parties.'" *Templeton v. Neodata Serv., Inc.*, 162 F.3d 617, 619 (10th Cir. 1998) (quoting *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996)). In *Templeton*, the plaintiff

---

[14] Defendants characterize the failure to bring a claim as a waiver. Doc. 68 at 10 ("Any discrimination claim based on an alleged failure to accommodate Plaintiff's PTSD has been waived, because Plaintiff did not request an accommodation from APS.").

took a medical leave of absence following an automobile accident that caused her serious head and neck injuries. *Id.* at 618. Her treating physician wrote a letter to the employer's insurance carrier stating that the physician had "not yet seen a detailed job description to answer specifically what duties [the plaintiff] can or cannot perform." *Id.* The employer therefore sent the physician plaintiff's job description and an updated physician certification to provide a status regarding the plaintiff's ability to work, but the plaintiff refused to authorize her physician to release the requested information. *Id.* The court held that the plaintiff failed to establish a violation of the ADA because "the employee's failure to provide medical information necessary to the interactive process precludes her from claiming that the employee violated the ADA by failing to provide reasonable accommodation." *Id.* at 619.

Likewise here, Plaintiff did not provide medical information to APS in order to allow for an interactive process. Plaintiff submitted a physician's statement for FMLA leave from Billie Poteet, her therapist, which stated that Plaintiff was unable to perform job functions due to PTSD depending on "the triggering agent," and indicating that Plaintiff was incapacitated from April 26, 2016 to May 9, 2016. Doc. 82-14 at 9. On May 29, 2016, APS EOS sent Plaintiff paperwork requesting information regarding her disability, impairments related to the condition, impacts of the condition of various activities, and possible accommodations. Plaintiff never returned the paperwork. Plaintiff also fails to allege any facts which show that she informed APS she needed an accommodation or that she engaged in the interactive process in any way with APS.[15] *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171-72 (10th Cir. 1999) ("In general, the

---

[15] In response to Defendants' facts, Plaintiff cites her Exhibit 13. Doc. 82 at 14 ¶ 25. The exhibit is an unsigned, undated, handwritten letter which states: "She told her she had PTSD 3 years ago. She needed no accommodation[,] only need to go to counselor 1x week." Doc. 82-13. This exhibit is unauthenticated and therefore not evidence, and in any event does not support an argument that Plaintiff requested or provided information for an accommodation.

interactive process must ordinarily begin with the employee providing notice to the employer of the employee's disability and any resulting limitations, and expressing a desire for reassignment if no reasonable accommodation is possible in the employee's existing job.").

Additionally, "[t]o establish a prima facie case of discrimination for failing to make reasonable accommodations, a disabled employee must show: (1) [s]he is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (2) [s]he was discriminated against because of [her] disability." *Valdez v. McGill*, 462 F. App'x 814, 817 (10th Cir. 2012). To that end, "[t]o recover under the ADA, a plaintiff must show a reasonable accommodation was possible." *Id.* at 819 (citation omitted). Here, Plaintiff acknowledges that IEP meetings are often emotionally charged, Doc. 68-2 at 131:8-16, and that the IEP meeting on April 14, 2016 is what triggered her PTSD. The accommodation Plaintiff seeks, however, is not a transfer to a less emotionally charged position. Indeed, one of Plaintiff's primary complaints is that Defendant transferred her *out of* the IEP teaching position. As Plaintiff explained at the January 16, 2020 hearing, the accommodation she sought after the April 14, 2016 incident was "to feel supported." Recording at 12:00. She does not, however, clarify precisely what that accommodation would entail. As such, even assuming Plaintiff appropriately brought a failure to accommodate claim, she has failed to make a prima facie case for such a claim.

## III. Retaliation

Although Plaintiff has generally asserted that Defendants retaliated against her, she does not bring a cognizable legal claim for retaliation. In her Third Amended Complaint for Employment Discrimination (the operative Complaint), she alleges that Defendants retaliated against her "for taking FMLA leave." Doc. 38 at 7. This, of course, is different than alleging

retaliation under the ADA. And, although her Complaint includes a check-box list of discriminatory conduct for her to choose from, including retaliation, Plaintiff did not check the box for retaliation. Doc. 38 at 4-5. When I asked Plaintiff at the January 16 hearing to describe any retaliation claims she is bringing, Plaintiff replied that APS retaliated against her because of her disability and/or because she took FMLA leave. Recording at 10:21.

The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Similar to a substantive disability discrimination claim, in order to establish a prima facie case for retaliation under the ADA, a plaintiff must show "(1) that [s]he engaged in protected activity; (2) [s]he was subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity; and (3) there was a causal connection between the protected activity and the adverse employment action." *Foster v. Mountain Coal Co.*, 803 F.3d 1178, 1187 (10th Cir. 2016) (quotations omitted). A prima facie case for retaliation under FMLA requires the same showing as that under the ADA. *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006). An adverse employment action requires a plaintiff to show "that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *White*, 548 U.S. at 68.

Even assuming Plaintiff engaged in a protected activity, whether it be taking FMLA leave, telling Ms. Hoppman that Mr. Kegler triggered her PTSD, or claiming that she has PTSD, Plaintiff cannot establish a prima facie case for retaliation because she did not suffer an adverse

employment action. As discussed above, Defendants laterally transferred Plaintiff to a position she was qualified for and which carried the same salary and medical benefits. "Whether a particular reassignment is materially adverse depends on the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all circumstances." *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (quotations omitted). Plaintiff provides no facts and no authority to establish that a reasonable employee would find that action materially adverse.

I therefore recommend granting summary judgment in Defendants' favor on Plaintiff's claims for retaliation.

## IV. State Law Claims

In addition to her ADA claims, Plaintiff also alleges that Defendants violated the NMHRA. Under the NMHRA, "it is an unlawful discriminatory practice for an employer to refuse to hire, to discharge, to promote or demote or to discriminate in matters of compensation, terms, conditions or privileges of employment against any person otherwise qualified because of . . . physical or mental handicap or serious medical condition . . . ." NMSA § 28-1-7(A). Defendants also move for summary judgment on Plaintiff's claims under state law for the same reasons applicable to the federal-law claims.

The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367. Nonetheless, the Court may decline supplemental jurisdiction if it has "dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Tenth Circuit has indicated that if, prior to trial, "all federal claims have been dismissed, the court may, *and usually should*, decline to exercise jurisdiction over any remaining state claims." *Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) (emphasis added); *see also Barnett v.*

30

*Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, --- F.3d ---, 2020 WL 1910439, at *6 (10th Cir. Apr. 20, 2020) (reversing a district court for failing to decline supplemental jurisdiction). Even where the parties have expended considerable effort in litigating the state-law claims in the federal forum, including conducting full discovery, it is appropriate to decline to exercise supplemental jurisdiction because that discovery can be used in state court. *Huntsinger v. Bd. of Dir. of E-470 Pub. Highway Auth.*, 35 F. App'x 749, 759-60 (10th Cir. 2002); *see, e.g.*, *Koch v. City of Del City*, 660 F.3d 1228, 1248 (10th Cir. 2011) (affirming a district court decision to decline supplemental jurisdiction after granting summary judgment on the federal claims). Further, the Supreme Court has indicated that in a removed case, like the instant case, remand is often preferable to dismissal without prejudice in order to "best promote the value of economy, conveniences, fairness, and comity." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 353 (1988).

Accordingly, I recommend declining supplemental jurisdiction over the claims arising under state law and remanding them to state court.

## MOTION TO EXCLUDE

Defendants moved to strike certain exhibits that Plaintiff attached to her response to the Motion for Summary Judgment. Doc. 100. Specifically, Defendants seek to exclude (1) Plaintiff's Exhibit 12 and page 1 of Plaintiff's Exhibit 14, namely, an unverified letter from Plaintiff to Ms. Hoppman dated April 26, 2019; (2) Plaintiff's Exhibit B,[16] which is the affidavit of Plaintiff's husband, Mitchell Neri[17]; and (3) Plaintiff's Exhibit H, which is a letter from Dr.

---

[16] Plaintiff labeled her exhibits with both numbers and letters.

[17] The Affidavit appears to be incomplete. Page 1 includes paragraphs 1 through 8, then page 2 skips to paragraph 11. Doc. 82-20. Additionally, page 2 appears to be from Plaintiff's Affidavit. *Compare* Doc. 82-20 at 2, *with* Doc. 82-19 at 2.

Stephanie Tucker, dated September 23, 2019. Defendants move to strike these exhibits under Federal Rule of Civil Procedure 37(c). Regarding the letter Plaintiff purportedly sent to Ms. Hoppman, they assert that Plaintiff failed to disclose the letter in discovery, the letter is unverified, and argue the letter appears to be altered. Regarding the affidavit of Plaintiff's husband, Defendants argue that Plaintiff affirmatively represented that Mitchell Neri would not be a witness. Doc. 100 at 6. And, similarly, Defendants argue that Plaintiff failed to disclose Dr. Tucker as an expert witness. Doc. 100 at 2, 7.

      None of these disputed exhibits are material to resolving this matter. In other words, even if the Court considers this evidence, it should conclude Defendants are entitled to summary judgment. First, although Plaintiff's purported letter to Ms. Hoppman might strengthen Plaintiff's pretext argument, it does not help demonstrate the existence of an adverse action. Second, Mr. Neri's affidavit is incomplete and repetitive of Plaintiff's affidavit, Doc. 82-19. Lastly, if the Court accepts my recommendation to grant Defendants' motion for summary judgment because Plaintiff has not shown an adverse employment action, whether Plaintiff actually has a disability becomes immaterial, as does the letter from Dr. Tucker that Plaintiff offers to establish the existence of a disability. Accordingly, I recommend denying Defendants' Motion to Strike as moot.

      Defendants also request "reasonable expenses, including attorney fees, caused by Plaintiff's failure to timely identify these documents and witnesses . . . ." Doc. 100 at 9. In response, Plaintiff requests that Defendants "be sanctioned for their tactics if this court feels Defendants' tactics are intentional and violates the scope of judicial process." Doc. 101 at 7. Federal Rule of Civil Procedure 37(c)(1)(A) provides that "[i]f a party fails to provide information or identify a witness as requested by Rule 26(a) or (e), . . .  the court, on motion and

after giving an opportunity to be heard[,] may order payment of the reasonable expenses, including attorney's fees, caused by the failure." Because I find that none of the exhibits are material to resolving the Motion for Summary Judgment, I recommend declining both sides' request for sanctions. *See* Fed. R. Civ. P. 37(c)(1) (exceptions to failure to disclose sanctions when the failure "was substantially justified or is harmless").

## CONCLUSION

For the foregoing reasons, I recommend that the Court find Plaintiff is unable to establish a prima facie case for her federal discrimination and retaliation claims. I further recommend the Court find that Plaintiff failed to plead a failure to accommodate claim under the FMLA. As a result, the Court need not address damages or Defendants' argument that Plaintiff failed to mitigate her damages.

I therefore recommend granting Defendants' Motion for Summary Judgment (Doc. 68) as to all federal claims in Plaintiff's Third Amended Complaint for Employment Discrimination, and remanding the remaining state law claims. Additionally, if the Court adopts this recommendation, none of the disputed exhibits are material. In this case, I recommend denying as moot Defendants' Motion to Exclude From Summary Judgment Consideration, including denying both parties' associated requests for sanctions (Doc. 100).

STEVEN C. YARBROUGH
UNITED STATES MAGISTRATE JUDGE

33

**THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 14 DAYS OF SERVICE** of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  **A party must file any objections with the Clerk of the District Court within the fourteen-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.**